IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AIX SPECIALTY INSURANCE       §
COMPANY,                      §
                              §
        Plaintiff,            §
                              §
v.                            §       CIVIL ACTION NO. H-12-507
                              §
UNIVERSAL CASUALTY COMPANY,   §
                              §
        Defendant.            §

<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[1] are Plaintiff's Motion for Partial Summary Judgment (Doc. 15) and Defendant's Cross-Motion for Summary Judgment (Doc. 26). The court has considered the motions, all relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's Motion for Partial Summary Judgment be **GRANTED IN PART, DENIED IN PART** and that Defendant's Motion for Summary Judgment be **GRANTED IN PART, DENIED IN PART**.

## I.  Case Background

The dispute between the parties in this case concerns insurance coverage. Insurer AIX Specialty Insurance Company ("AIX" or "Plaintiff"), filed this action against insurer Universal Casualty Company ("UCC" or "Defendant"), seeking a declaration that Defendant is and has been obligated to defend Ashford Glass and

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 12.

Mirror, Inc. ("Ashford"), the parties' mutual named insured, and G.T. Leach Builders, L.L.C. ("G.T. Leach"), a potential additional insured, with respect to two underlying contractual suits.

## A.   __Procedural History__

Plaintiff filed this lawsuit against Defendant on February 21, 2012.[2]   On June 29, 2012, Plaintiff filed the pending motion for partial summary judgment on Defendant's alleged duty to defend a mutual named insured and potential additional insured.[3]   Two weeks later, on July 13, 2012, the court granted leave for G.T. Leach to intervene in the lawsuit; the same day, G.T. Leach filed a complaint in intervention against Defendant.[4]

On July 27, 2012, Defendant filed the pending response to Plaintiff's motion for partial summary judgment and cross-motion for summary judgment, to which both Plaintiff and G.T. Leach responded on August 31, 2012.[5]

## B.   __The Insurance Policies__

In 2005, UCC issued a Commercial General Liability ("CGL")

---

[2]      See Doc. 1, Pl.'s Compl.; see also Doc. 6, Def.'s Ans. to Pl.'s Compl.

[3]      See Doc. 15, Pl.'s Mot. for Partial Summ. J.

[4]      See Doc. 19, G.T. Leach's Mot. for Leave to Intervene; Doc. 20, Or. Dated July 13, 2012; Doc. 21, G.T. Leach's Compl.; see also Doc. 22, Def.'s Ans. to G.T. Leach's Compl.; Doc. 30, G.T. Leach's 3rd Party Compl.

[5]      See Doc. 26, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J.; Doc. 31, G.T. Leach's Resp. to Def.'s Cross-Mot. for Summ. J.; Doc. 32, Pl.'s Resp. to Def.'s Cross-Mot. for Summ. J. & Reply in Support of Mot. for Partial Summ. J.; see also Doc. 33, Def.'s Reply to Pl.'s Resp. to Def.'s Cross-Mot. for Summ. J.; Doc. 35, Def.'s Reply to G.T. Leach's Resp. to Def.'s Cross-Mot. for Summ. J.; Doc. 36, Pl.'s Sur-reply to Def.'s Cross-Mot. for Summ. J. & Pl.'s Mot. for Partial Summ. J.

policy to Ashford, effective from October 24, 2005, through October
24, 2006.[6]  UCC renewed the policy in 2006, effective from October
24, 2006, through October 24, 2007, and in 2007, effective from
October 24, 2007, through October 24, 2008.[7]  In each of the
policies, Ashford's business was described as "Glass Dealer/Glazer;
Door, Window or Assembled Millworks- Installation."[8]  In exchange
for the payment of a premium, UCC agreed to pay "those sums that
the insured becomes legally obligated to pay as damages because of
'bodily injury' or 'property damage' to which this insurance
applies."[9]

    The policies covered bodily injury or property damage "caused
by an 'occurrence' that takes place in the 'coverage territory'"[10]
and that "first occurs during the policy period."[11]  An "occurrence"

---

[6]   <u>See</u> Doc. 26-3, Ex. A to Def.'s Resp. to Pl.'s Mot. for Partial Summ.
J., 2005-06 CGL Policy.

[7]   <u>See</u> Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ.
J., 2006-07 CGL Policy; Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for
Partial Summ. J., 2007-08 CGL Policy.

[8]   <u>See</u> Doc. 26-3, Ex. A to Def.'s Resp. to Pl.'s Mot. for Partial Summ.
J., 2005-06 CGL Policy, p. 1; Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for
Partial Summ. J., 2006-07 CGL Policy, p. 1; Doc. 26-5, Ex. C to Def.'s Resp. to
Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 1.

[9]   Doc. 26-3, Ex. A to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J.,
2005-06 CGL Policy, p. 20, § 1.1(a); Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s
Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 26; Doc. 26-5, Ex.
C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 31,
§ 1.1(a).

[10]   Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J.,
2006-07 CGL Policy, p. 32, § 1.1(b)(1); Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s
Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 31, § 1.1(b)(1).

[11]   Doc. 26-3, Ex. A to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J.,
2005-06 CGL Policy, p. 31, § 1.1(b); Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s
Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 31, § 1.1(b); Doc. 26-5, Ex.
C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 30,

was defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," and defined "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property," or "[l]oss of use of tangible property that is not physically injured."[12] Excluded from coverage was property damage arising out of particular real property on which the insured, or contractors and subcontractors working on the insured's behalf, worked and damage to property that must be restored, repaired, or replaced due to the insured's work being improperly performed on it.[13] Also excluded from coverage was property damage to the insured's work or product,[14] as well as damage to property that was impaired or

---

§ 1.1(b).

[12]    Doc. 26-3, Ex. A to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2005-06 CGL Policy, pp. 29-30, §§ 5.12, 5.15; (b)(1)-(2); Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, pp. 41-42, §§ 5.12, 5.15; Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, pp. 40-41, §§ 5.12, 5.15.

[13]    See Doc. 26-3, Ex. A to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2005-06 CGL Policy, p. 22, §§ 1.2(j)(5)-(6); (b)(1)-(2); Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 34, §§ 1.2(j)(5)-(6); Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 33, §§ 1.2(j)(5)-(6).

[14]    The policies used the terms "your product," defined as "any goods or products, other than real property, manufactured, sold, handled, distributed and disposed by" the insured or those trading under the name of the insured, and "your work," defined as work or operations performed by the insured or on the insured's behalf and "[m]aterials, parts or equipment furnished in connection with such work or operations." Doc. 26-3, Ex. A to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2005-06 CGL Policy, p. 30, §§ 5.18, 5.19; Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 42, §§ 5.18, 5.19; Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 41, §§ 5.18, 5.19.

otherwise not physically injured.[15]

Included as an insured pursuant to an endorsement to the CGL policies was "the person or organization [ ] for whom you [Ashford] are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy."[16] Under the 2005-2006 and 2006-2007 policies, coverage was provided to an additional insured only with respect to "damages arising out of the active negligence of you [Ashford] or any of your agents or 'employees' for which that [additional insured] is vicariously liable."[17]  The 2007-2008 policy covered an additional insured for property damage only when said damage was "caused, in whole or in part, by: 1. [Ashford's] acts or omissions; or 2. The acts or omissions of those acting on [Ashford's] behalf; In the performance of [Ashford's] ongoing operations for the additional insured."[18]

Specifically with regard to additional insureds, the policies

---

[15]    See Doc. 26-3, Ex. A to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2005-06 CGL Policy, p. 22, §§ 1.2(k), 1.2(l), 1.2(m); Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 34, §§ 1.2(k), 1.2(l), 1.2(m); Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 33, §§ 1.2(k), 1.2(l), 1.2(m).

[16]    Doc. 26-3, Ex. A to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2005-06 CGL Policy, p. 47, ¶ A; Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 9, ¶ A; Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 9, ¶ A.

[17]    Doc. 26-3, Ex. A to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2005-06 CGL Policy, p. 47, ¶ A; Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 9, ¶ A.

[18]    Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 9, ¶ A.

excluded coverage for damages "arising out of the rendering of, or failure to render, any professional architectural, engineering or surveying services,"[19] as well as damage occurring after the additional insured's completion of "[a]ll work, including materials, parts of equipment furnished in connection with such work, on the project (other than service, maintenance or repairs)."[20]

## C.   **The 2010 Underlying Lawsuits**[21]

### 1.  **Emerald Galveston Holdings, Inc.'s Suit**

Emerald Galveston Holdings, Inc. ("EGH") filed suit against G.T. Leach in the 129th Judicial District of Harris County, Texas, arising out of a construction contract entered into between Emerald Towers, Ltd. ("Emerald") and G.T. Leach for the construction of a condominium project in Galveston, Texas.[22]  EGH later added several

---

[19]     Doc. 26-3, Ex. A to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2005-06 CGL Policy, p. 47, ¶ B(2)(a); Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 9, ¶ B(2)(a); Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 9, ¶ B(2)(a).

[20]     Doc. 26-3, Ex. A to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2005-06 CGL Policy, p. 47, ¶ B(2)(b); Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 9, ¶ B(2)(b); Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 9, ¶ B(2)(b).

[21]     As of the date of this Memorandum and Recommendation, the parties have not indicated that subsequent amended complaints have since been filed in the underlying actions.  Therefore, in considering the parties' motions, the court will assume that the most recent pleadings before it are the live pleadings of the underlying lawsuits.  The facts alleged in the underlying lawsuits are taken directly from the live pleadings.

[22]     See Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., EGH's Orig. Compl., pp. 47-52; see also Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., EGH's 2nd Am. Compl., p. 3.

of the subcontractors hired by G.T. Leach on the project, including Ashford, as defendants in the lawsuit.[23]   EGH alleged causes of action for breach of warranty, breach of contract, negligence, and negligent misrepresentation, and sought to recover damages and attorneys fees.[24]

Under the construction contract between Emerald and G.T. Leach, G.T. Leach was to complete the project pursuant to specifications and plans provided to it.[25]   Any changes to the project had to be approved by the International Bank of Commerce ("IBC"), the project's lender and third-party beneficiary to the construction contract.[26]   G.T. Leach also entered into contracts, of which Emerald and IBC were third-party beneficiaries, with subcontractors on the project, including Ashford.[27]

After the construction contract was executed, Emerald and G.T. Leach "materially changed the 'skin' of the building from what was required in the original plans and specifications" without obtaining approval from IBC or the project's engineer of record.[28]

---

[23]   See Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., EGH's 1st Am. Compl., pp. 25-26; Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., EGH's 2nd Am. Compl., pp. 1-2.

[24]   See generally, Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., EGH's 2nd Am. Compl.

[25]   See id. ¶ 12.

[26]   See id.

[27]   See id. ¶¶ 14-15.

[28]   Id. ¶ 17.

"[G.T.] Leach, one or more of the Subcontractors, and others participated in the design and construction" of the unapproved changes.[29]  The changes were negligently implemented by G.T. Leach and the subcontractors, and resulted in "defective construction, [and] damage to property and work not otherwise defective," in addition to creating issues with respect to windstorm certification.[30]  G.T. Leach and the subcontractors' workmanship was allegedly negligent, as was G.T. Leach's supervision of the subcontractors.[31]

The construction project also suffered from "water and moisture infiltration" that damaged otherwise nondefective property.[32]  The first leaks occurred in the summer of 2007, prior to the project's substantial completion, though neither EGH nor IBC learned about the leaks until later.[33]  After substantial completion of the project, these leaks persisted and additional leaks formed, "causing damage to building components around the pool, deck, and areas below, at the 5th and 6th floor levels."[34]  The leaks, EGH alleged, were the result of "a combination of negligent failure to follow design requirements . . ., industry standards,

---

[29]    Id.

[30]    Id.

[31]    See id.

[32]    Id. ¶ 18.

[33]    See id. ¶¶ 18-19.

[34]    Id. ¶ 18.

manufacturer's recommendations, as well as poor joint construction, improper sheathing, thin stucco, poor sealing around penetrations, and other construction deficiencies."[35]  Some repairs made in 2008, 2009, and 2010 by G.T. Leach and the subcontractors after occupancy of the condominiums made the condition of the leaks worse, causing damage to, among others, "insulation, framing, and finishes which were not otherwise defective."[36]  In particular, Ashford failed to repair all of its deficient original work, though Ashford correctly repaired some of its defective work in 2011.[37]

The cost of remedying the construction deficiencies and repairing the water-damaged property was anticipated to exceed two million dollars.[38]  Further, as a result of the project's defects, the market value of the property was severely damaged.[39]  Neither G.T. Leach nor any of the subcontractors reimbursed EGH for the costs incurred in remedying the project's construction defects.[40]

In response to EGH's allegations, G.T. Leach filed a third-party petition against each of the subcontractors involved in the

---

[35]   Id.

[36]   Id. ¶ 19.

[37]   See id. ¶ 24.

[38]   See id. ¶ 20.

[39]   See id. ¶ 22.

[40]   See id. ¶ 24.

construction project, including Ashford.[41]   Pursuant to the terms
of the contracts between G.T. Leach and the subcontractors, each of
the subcontractors agreed to provide commercial liability insurance
to G.T. Leach by naming G.T. Leach as an additional insured on
their respective CGL policies.[42]   These agreements also provided
that the subcontractors would defend and indemnify G.T. Leach in
any lawsuit arising from work provided by the subcontractors.[43]
G.T. Leach claimed that the subcontractors' work formed the basis
of EGH's claims against G.T. Leach and alleged a cause of action
for breach of contract against the subcontractors because they
failed to provide a contractual defense and indemnification in
accordance with the aforementioned provisions of the subcontracts.[44]
In the alternative, G.T. Leach asserted that it was entitled to
contribution from the subcontractors.[45]

### 2.   The Condominium Association's Suit

Emerald By The Sea Condominium Association, Inc. ("Condo
Association") filed a lawsuit in the 212th Judicial District of
Galveston County, Texas, against G.T. Leach arising out of G.T.
Leach's construction of the aforementioned condominium complex

---

[41]   See Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J.,
G.T. Leach's 1st Am. 3rd Party Compl.

[42]   See id. ¶ 5.2.

[43]   See id. ¶ 5.3.

[44]   See id. ¶¶ 5.1, 5.6, 6.3-6.4, 7.2-7.3.

[45]   See id. ¶ 6.6.

located in Galveston.[46]  After the completion of this construction project, the Condo Association "discovered numerous latent construction defects in the [p]roject."[47]  The Condo Association generally alleged that G.T. Leach's acts and omissions constituted negligent construction and a breach of the implied warranty of workmanlike construction, resulting in damages.[48]  In addition to damages, the Condo Association sought to recover attorneys' fees.[49]

In response to the Condo Association's lawsuit, G.T. Leach filed a third-party petition against each of the subcontractors involved in the construction project, including Ashford.[50]  G.T. Leach appears to assert that the construction defects for which it was being sued were "associated with the construction services provided by the [subcontractors]."[51]  G.T. Leach asserted a claim for breach of contract against the subcontractors based on their failure to provide a defense and to indemnify G.T. Leach pursuant

---

[46]    See Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., Condo Association's Orig. Compl., ¶¶ IV.1-2.

[47]    Id. ¶ IV.3

[48]    See id. ¶¶ V.1-2.

[49]    See id. ¶ VII.1.

[50]    See Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., G.T. Leach's Orig. 3rd Party Compl.  The court notes that, with the exception of the case caption and paragraphs 5.1 and 5.2, G.T. Leach's third-party petition refers to the plaintiff in the Condo Association lawsuit as EGH and responds to allegations made solely in the lawsuit filed by EGH, discussed above.  See generally id.

[51]    Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., G.T. Leach's Orig. 3rd Party Compl., ¶ 6.4.

to the terms of their subcontract agreements with G.T. Leach.[52]

The Condo Association's suit was subsequently consolidated with EGH's lawsuit in the 129th Judicial District of Harris County, Texas.

## II.  Legal Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  Anderson, 477 U.S. at 250; TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex

---

[52]     See id. ¶¶ 7.1-7.2.

12

Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment.  Celotex Corp., 477 U.S. at 322.  In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial.  Id. at 324.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party."  Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001); see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc., 288 F.3d 222, 227 (5th Cir. 2002).  The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence."  Honore v. Douglas, 833 F.2d 565, 567 (5th Cir. 1987).

However, the nonmoving party must show more than "some metaphysical doubt as to the material facts."  Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995).  Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden.  Brown, 337 F.3d at 541; Ramsey v. Henderson,

13

286 F.3d 264, 269 (5th Cir. 2002).  The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

### III.  Principles of Insurance Law

As this declaratory action is in federal court under diversity jurisdiction, state law governs substantive matters.  See Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938).  Because Texas is the forum state in this matter, the court applies Texas' choice of law rules. See Universal Underwriters Ins. Co. v. Pan Am. Ins. Co., 450 F.2d 1050, 1052 (5th Cir. 1971).

### A.  Burden of Proof and Contract Interpretation

In general, the insured bears the initial burden of establishing that coverage is potentially provided by the applicable insurance policy, while it is the insurer's burden to prove the applicability of an exclusion permitting it to deny coverage.  Lincoln Gen. Ins. Co. v. Reyna, 401 F.3d 347, 350 (5th Cir. 2005)(applying Texas law); see also Tex. Ins. Code Ann. § 554.002.  If the insurer is successful, the burden shifts back to the insured to prove that an exception to the exclusion applies. Guar. Nat'l Ins. Co. v. Vic Mfg. Co., 143 F.3d 192, 193 (5th Cir. 1998)(applying Texas law).

14

Under Texas law, insurance policies are subject to the rules of contract interpretation.  Azrock Indus., 211 F.3d at 243 (applying Texas law); Progressive County Mut. Ins. Co. v. Sink, 107 S.W.3d 547, 551 (Tex. 2003).  "Terms in contracts are given their plain, ordinary, and generally accepted meaning unless the contract itself shows that particular definitions are used to replace that meaning."  Bituminous Cas. Corp. v. Maxey, 110 S.W.3d 203, 208-09 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

**B.   Duty to Defend**

In Texas, an insurer's duty to defend is a separate and distinct duty from its duty to indemnify.  Trinity Universal Ins. Co. v. Cowan, 945 S.W.2d 819, 821-22 (Tex. 1997).  Under the "eight-corners" rule, an insurer's duty to defend its insured arises if the complaint in the suit against the insured alleges facts that potentially support claims for which there is coverage. Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co., 279 S.W.3d 650, 654 (Tex. 2009).  Where more than one pleading exists in the underlying suit, "the duty to defend is determined by examining the latest, and only the latest, amended pleadings."  Rhodes v. Chicago Ins. Co., a Div. of Interstate Nat. Corp., 719 F.2d 116, 119 (5th Cir. 1983); see Admiral Ins. Co. v. H & W Indus. Services, Inc., No. EP-10-CV-273-KC, 2011 WL 318277, at *4 (W.D. Tex. Feb. 1, 2011) (quoting Rhodes, 719 F.2d at 119)(unpublished).

In determining whether this duty exists, the court's only job

is to compare the four corners of the pleading with the four corners of the insurance policy. Reyna, 401 F.3d at 350; see Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs. Fast Motor Lines, Inc., 939 S.W.2d 139, 141 (Tex. 1997). "Facts outside the pleadings, even those easily ascertained, are ordinarily not material to the determination . . . ." Liberty Mut. Ins. Co. v. Graham, 473 F.3d 596, 600 (5th Cir. 2006)(applying Texas law).

When applying the eight-corners rule, the court considers the factual allegations without regard to their truth or falsity. See GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church, 197 S.W.3d 305, 310 (Tex. 2006). Only the facts alleged, not the legal theories asserted, are relevant. Reyna, 401 F.3d at 350. The court interprets the allegations liberally and resolves all doubts regarding the duty to defend in favor of the insured. Merchs. Fast Motor Lines, Inc., 939 S.W.2d at 141. However, the court may not "read facts into the pleadings," "look outside the pleadings, or imagine factual scenarios [that] might trigger coverage." Pine Oak Builders, Inc., 279 S.W.3d at 655 (quoting Merchs. Fast Motor Lines, Inc., 939 S.W.2d at 142).

An insurer is required to defend its insured against suit as long as the allegations potentially give rise to at least one claim covered by the insurance policy, regardless of the number of claims potentially not covered. Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co., 141 S.W.3d 198, 201 (Tex. 2004)("A liability insurer is

16

obligated to defend a suit if the facts alleged in the pleadings would give rise to any claim within the coverage of the policy.").

## IV.  Analysis

Plaintiff moves for summary judgment seeking a declaration that Defendant has a duty to defend Ashford and G.T. Leach in the underlying suits brought by EGH and the Condo Association arising out of the construction of a condominium project in Galveston, Texas.  Defendant argues that it does not owe a duty to defend or to indemnify Ashford and G.T. Leach in either of the underlying lawsuits and moves for summary judgment seeking declarations to that effect.  Specifically, Defendant argues that it does not have a duty to defend or indemnify Ashford or G.T. Leach because: (1) coverage under the policies was not triggered by the underlying lawsuits; (2) G.T. Leach is not an additional insured; (3) the policies do not provide for the indemnity and defense of G.T. Leach regardless of fault or for G.T. Leach's own negligence; and (4) several exclusions to the insurance policies preclude coverage. The court considers the merits of the parties' arguments.

## A.  Policies Triggered by the Underlying Lawsuits

Defendant contends that it does not have a duty to defend Ashford or G.T. Leach in the underlying Condo Association lawsuit because the live petition in that action does not allege facts that potentially support covered claims.  Specifically, Defendant argues that it does not have a duty to defend Ashford in the Condo

17

Association lawsuit because Ashford is not a named defendant in that suit.  Plaintiff, on the other hand, contends that G.T. Leach's third-party complaint in the that suit, which alleges that G.T. Leach is entitled to contribution from Ashford and other subcontractors for the Condo Association's alleged damages, falls within the court's eight-corners rule for purposes of determining Defendant's duty to defend in the Condo Association suit.

Defendant has not cited, and the court has not located, any applicable case law indicating that a primary insured's absence as a first-party defendant in an underlying lawsuit presents a bar to subsequent claims that the insurer has a duty to defend its insured in the underlying suit.  Indeed, case law indicates that an insured's status as a third-party defendant in the underlying litigation does not bear on the insurer's potential coverage liability in that litigation.  See, e.g., Davis-Ruiz Corp. v. Mid-Continent Cas. Co., 281 Fed. App'x 267, 269 (5th Cir. 2008) (involving duty to defend claim arising from a dispute between a third-party defendant in an underlying suit and the third-party defendant's insurer); Olin Cor. v. Koppers Co., Inc., 986 F.2d 1419, 1993 WL 58800, at *1 (5th Cir. 1993) (involving a duty to defend claim by a third-party defendant against its insurer).  The court therefore finds that Ashford need not be a first-party defendant in the Condo Association suit to trigger coverage under Defendant's CGL policies.

18

In the Condo Association lawsuit, G.T. Leach filed a third-party complaint against Ashford, alleging that the construction defects for which it was being sued were associated with the work of the subcontractors, including Ashford.  This allegation potentially gives rise to a claim of property damage caused by an occurrence under the CGL policies, thereby triggering Defendant's duty to defend Ashford as a primary insured in the Condo Association suit.[53]

With respect to the EGH lawsuit, Defendant contends that the coverage provisions of the 2005-2006 and 2007-2008 CGL policies were not triggered by the facts alleged in the underlying live complaint.  In support, Defendant points to the 2005-2006 and 2007-2008 CGL policy provisions limiting coverage to damages that first occurred during the applicable policy period.  Because EGH's live complaint alleged that "[i]t is believed that some leaks first occurred in the summer of 2007," Defendant argues, neither the 2005-2006 nor the 2007-2008 policies were triggered.  The parties do not dispute that the 2006-2007 policy is potentially implicated in the underlying litigation.

EGH's live complaint does not allege facts, read in the light most favorable to the insured, that any property damage occurred

_____

[53]   Aside from its argument that it has no duty to defend Ashford in the Condo Association suit because Ashford is not a named first-party defendant in that lawsuit, Defendant offers no arguments on summary judgment that the CGL policies did not provide coverage for Ashford in the Condo Association lawsuit. The court discusses the argument that Defendant did not have a duty to defend G.T. Leach in Condo Association's lawsuit below, in the section entitled "G.T. Leach's Additional Insured Status."

prior to the summer of 2007. The court therefore agrees with Defendant that coverage under the 2005-2006 CGL policy was not triggered by the facts alleged in the underlying litigation. The court notes, however, that in addition to alleging that the first leaks were thought to have occurred in the summer of 2007, EGH's complaint alleges that "[a]dditional leaks have occurred since then."[54] The complaint also references repairs made in 2008, 2009, and 2010. These allegations, interpreted liberally in favor of coverage, raise the possibility that new leaks and subsequent property damage occurred after the summer of 2007 and prior to repairs in 2008, 2009, and 2010. See GEICO General Ins. Co., 357 S.W.3d at 825 (determining that an underlying plaintiff's allegations of a conspiracy spanning decades and use of the past tense in his complaint, combined with the court's knowledge regarding asbestos-related diseases, alleged a potential occurrence within a 1969-1970 CGL policy). Given that EGH's complaint alleges property damage potentially occurring within the 2007-2008 CGL policy's coverage period, the court finds that the 2007-2008 policy was triggered.

Defendant also argues that the "fortuity doctrine," which consists of the known-loss and the loss-in-progress doctrines precludes coverage under the 2007-2008 CGL policy. See Lennar

---

[54]     Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., EGH's 2nd Am. Compl., ¶ 19.

<u>Corp. v. Great Am. Ins. Co.</u>, 200 S.W.3d 651, 687 (Tex. App.–Houston [14th Dist.] 2006, pet. filed).   Together, the doctrines preclude insurance coverage for losses that the insured knew had occurred and losses that the insured knew or should have known were ongoing at the at the time it purchased the policy.   <u>Id.</u> at 687-88. Although the fortuity doctrine centers on the insured's knowledge of preexisting or ongoing damage, the doctrine is necessarily inapplicable when the property damage is alleged to have occurred within the policy period.   As discussed above, EGH's live complaint in the underlying litigation alleges property damage potentially occurring within the 2006-2007 and 2007-2008 CGL policies' coverage period.   The fortuity doctrine therefore does not preclude coverage under either of these policies.

     Given the above, the court considers the parties' remaining arguments as they apply to the 2006-2007 and 2007-2008 CGL policies.

**B.   <u>G.T. Leach's Additional Insured Status</u>**

     Plaintiff contends that Defendant has a duty to defend G.T. Leach pursuant to the additional insured endorsements contained in Defendant's CGL policies.   To the extent Plaintiff's arguments assert that G.T. Leach is an additional insured in the Condo Association lawsuit, the court disagrees.   In the Condo Association suit, the underlying plaintiff sued only G.T. Leach, alleging claims against G.T. Leach for breach of the implied warranty of

good and workmanlike conduct and negligent construction based on latent construction defects present in the condominium project. The Condo Association's complaint in no way implicates work, whether defective or not, completed by Ashford or any other subcontractor. Given the utter absence of such allegations, coverage as an additional insured pursuant to the CGL policies is not triggered by the underlying complaint. That G.T. Leach subsequently filed a third-party petition against Ashford does not alter the eight corners of the underlying plaintiff's complaint and the relevant insurance policy to which the court must refer in determining the duty to defend.[55] Accordingly, Defendant has no duty to defend G.T. Leach against the claims asserted by the Condo Association.

The court now turns to G.T. Leach's status as an additional insured in the EGH lawsuit. Defendant argues that G.T. Leach is not an additional insured under the 2006-2007 CGL policy because the coverage under the policy's "Additional Insured-Owners, Lessees or Contractors" endorsement extends only to damages arising out of Ashford's active negligence for which G.T. Leach is vicariously liable. According to Defendant, the plain language of the underlying litigation does not allege that G.T. Leach was vicariously liable for Ashford's conduct, and, therefore, G.T.

---

[55]     The court is unpersuaded by Plaintiff's argument that the court should consider the "twelve corners" of the underlying complaint, the insurance policy, and the third-party complaint in assessing whether a duty to defend exists in this situation.

Leach did not qualify as an additional insured.

Recognizing G.T. Leach's identification of Ashford and other subcontractors as the parties responsible for EGH's property damages, EGH alleged that "at least some, if not all, of the damages were caused by Leach's subcontractors during construction, and during botched repair efforts after substantial completion."[56] The complaint continues, stating that, under a provision of the construction contract between Emerald and G.T. Leach, "[G.T.] Leach is fully responsible and liable for costs of correcting defective work . . . ."[57]  Although EGH is suing G.T. Leach and Ashford, as well as other subcontractors on the project, for their respective negligence in constructing the condominium project, a liberal construction of the allegations indicates that G.T. Leach is a party liable for the damages sought by EGH, regardless of whether G.T. Leach or the subcontractors caused the alleged property damage.  The court therefore finds that EGH's underlying allegations are sufficient to trigger the additional insured endorsement of the 2006-2007 CGL policy.[58]

---

[56]   Id. ¶ 23.

[57]   Id. ¶ 24.

[58]   To the extent Defendant argues that the underlying allegations do not trigger additional insured coverage pursuant to the 2006-2007 policy endorsement entitled "Additional Insured-Owners, Lessees or Contractors-Completed Operations," the court agrees.  The court's finding that additional insured coverage in the 2006-2007 CGL policy was triggered is based on the endorsement therein entitled "Additional Insured-Owners, Lessees or Contractors."  Compare Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 9, with Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 11.

With respect to the "Additional Insured-Owners, Lessees or Contractors" endorsement of the 2007-2008 CGL policy, Defendant focuses on the term "caused by," arguing that because EGH sued G.T. Leach for its own negligence, and not that of its subcontractors, G.T. Leach does not qualify as an additional insured under the policy.  For the same reasons articulated above, namely that EGH's complaint alleged that G.T. Leach was liable for the costs incurred by EGH to remedy the alleged defective construction, the court finds that Defendant's additional insured endorsement was triggered as to G.T. Leach by EGH's underlying allegations.

Defendant also points to language in the "additional insured" provision of the 2007-2008 CGL policy stating that an entity's status as an additional insured would expire when Ashford's operations for the additional insured are completed. Citing EGH's allegations that Ashford conducted repairs in 2008, Defendant reasons that Ashford's work for G.T. Leach was completed in 2008, and, therefore, "there does not appear to be any allegations which can be liberally construed to suggest that [Ashford's] operations for G.T. Leach were still ongoing during the 2007-2008 time frame."[59]  The court disagrees.  Although the underlying complaint alleges that repair efforts were made after occupancy of the complex, i.e., "sporadically in 2008, 2009, and 2010," there is nothing in the complaint to indicate that Ashford was not engaged

---

[59]    Doc. 26, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., p. 13.

in ongoing operations from the policy period covering October 24, 2007, through October 24, 2008.[60]   Indeed, the underlying allegations discussed above—that some leaks occurred prior to substantial completion of the project and some leaks occurred after the summer of 2007—raise the possibility that Ashford's operations were ongoing during the 2007-2008 policy period, consequently triggering the additional insured endorsement of the 2007-2008 policy.

**C.**   **Effect of the CGL Policies' Contractual Liability Provisions**

Defendant also notes that an endorsement to the CGL policies excludes from the definition of "insured contract" any part of a contract or agreement "[t]hat provides for indemnity and defense of any person or organization for the party's sole negligence and/or provides for indemnity and defense of any person or organization regardless of fault."[61]   Because the subcontract between Ashford and G.T. Leach contains language allegedly obligating Ashford to defend and indemnify G.T. Leach for any damages arising out of Ashford's work, regardless of the cause or of G.T. Leach's fault or negligence, Defendant argues that the aforementioned endorsement

---

[60]   Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., EGH's 2nd Am. Compl., ¶ 19.

[61]   Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 31, ¶ 4.4; Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 30, ¶ 4.4

exclusion eliminates coverage for G.T. Leach.[62]

Whether the provision containing the language obligating Ashford to defend and indemnify G.T. Leach for G.T. Leach's sole negligence or regardless of fault is enforceable does not bear on the court's analysis of Defendant's duty to defend G.T. Leach in the underlying litigation initiated by EGH. Even assuming, without deciding, that the subcontract provision is unenforceable does not release Defendant of its potential duty to defend G.T. Leach pursuant to the additional insured endorsements of the CGL

---

[62]     In relevant part, the subcontract agreement between G.T. Leach and Ashford reads as follows:
> [Ashford] shall fully protect, indemnify and defend [G.T. Leach], Owner, and Architect . . . and hold them harmless from and against any and all claims, demands, liens, damages, causes of action, liabilities of any and every nature whatsoever, losses and expenses, including but not limited to attorneys' fees and court costs, arising in any manner, directly or indirectly, out of or in connection with or in the course of or incidental to any of [Ashford's] Work and obligations as provided in the Contract Documents, including any extra work, (regardless of cause or of any concurrent or contributing fault or negligence of [G.T. Leach], Owner, or Architect . . . ) or any breach of or failure to comply with any of the provisions of this Subcontract or the Contract Documents by [Ashford]. [Ashford] shall fully protect, indemnify and defend [G.T. Leach], Owner, and Architect . . . and hold them harmless from and against any and all claims, demands, causes of action, damages, and liabilities for injury to or death of [Ashford or any of Ashford's employees, agents, subcontractors, or suppliers], or for the destruction of tangible property (other than the work itself) including the loss of use resulting there from, arising in any manner, directly or indirectly, out of or in connection with or in the course of or incidental to any work or operation(s) of [Ashford] or [G.T. Leach], Owner, or Architect. . . AND REGARDLESS OF CAUSE OR ANY FAULT OR NEGLIGENCE OF [G.T. LEACH], OWNER, OR ARCHITECT . . . WITHOUT REGARD OF CAUSE OR OF ANY CONCURRENT OR CONTRIBUTING FAULT OR NEGLIGENCE, WHETHER SOLE,  JOINT OR CONCURRENT, ACTIVE OR PASSIVE.

Doc. 15-2, Ex.  2 to Pl.'s Mot. for Partial Summ. J., Ashford/G.T. Leach Subcontract Agreement, § 5.7.

26

policies.[63]  The court therefore need not resolve the enforceability
of the provision contained in the subcontract between G.T. Leach
and Ashford in order to resolve whether Defendant has a duty to
defend.

**D.   Applicability of Policy Exclusions**

Defendant asserts that several exclusions contained in the CGL
policies preclude coverage for Ashford in the underlying
litigation.[64]    Specifically, Defendant cites the following
exclusions as precluding coverage: (1) contractual liability
endorsement exclusion entitled "Exclusion-Construction Professional
Liability;"[65] (2) contractual liability endorsement exclusion
entitled "Exclusion-Construction Management Errors and Omissions;"[66]

_____

[63]     The court notes that a separate provision of the subcontract
agreement between G.T. Leach and Ashford obligated Ashford to include G.T. Leach
as an additional insured in its CGL policies.  See id. § 5.2(1).

[64]     Defendant does not argue that the same exclusions preclude coverage
for G.T. Leach.  Given that Plaintiff is moving for summary judgment on
Defendant's alleged duty to defend both Ashford and G.T. Leach in the underlying
litigation, the court considers Defendant's cited exclusions as they apply to
both potential insureds to whom Defendant may owe a duty to defend.

[65]     The "Construction Professional Liability" exclusion precludes
coverage for damage arising out of:
    1.  The preparing, approving, or failure to prepare or approve,
    maps, shop drawings, opinions, reports, surveys, filed orders,
    change orders or drawings and specifications by an architect,
    engineer or surveyor;
    2.  Inspection, supervision, quality control, architectural or
    engineering activities done by or for you.
Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL
Policy, p. 13; Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ.
J., 2007-08 CGL Policy, p. 12.

[66]     In relevant part, the "Construction Management Errors and Omissions"
endorsement exclusion precludes coverage for property damage arising out of:
    1.  The preparing, approving, or failure to prepare or approve
    maps, drawings, opinions, reports, surveys, change orders,
    designs or specifications by any architect, engineer or
    surveyor performing services on a project on which you serve as
    construction manager, or

(3) contractual liability endorsement exclusion entitled "Exclusion- Exterior Insulation and Finish System;"[67] (4) the business risk exclusion of provision 1.2(j); (5) the "damage to your product" exclusion of provision 1.2(k); (6) the "damage to your work" exclusion of provision 1.2(l); and (7) the "damage to impaired property or property not physically injured" exclusion of provision 1.2(m).[68] The court begins with consideration of the three endorsement exclusions.

Defendant argues that the "Construction Professional Liability" and the "Construction Management Errors and Omissions" endorsement exclusions preclude coverage, thus negating any duty to

---

2. Inspection, supervision, quality control or engineering services done by or for you on a project on which you serve as construction manager.

This exclusion does not apply to "bodily injury" or "property damage" due to construction or demolition work done by you, your "employees" or your subcontractors.

Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 14; Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 13.

[67] The "Exterior Insulation and Finish System" exclusion precludes coverage for property damage "included in the 'products-completed operations hazard' for any claims or suits arising out of Exterior Insulation and Finish Systems (commonly referred to as synthetic stucco) application, installation, use or sale." Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 18; Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 17.

[68] Defendant also argues that Ashford's work on the project exceeded the work classification under which Ashford was insured pursuant to the CGL policies. The court finds no merit to this argument. Ashford's business was described as "Glass Dealer/Glazer; Door, Window or Assembled Millworks- Installation." Citing the subcontract between G.T. Leach and Ashford, Defendant points out that Ashford's work on the project included the furnishing and installation of "aluminum curtain walls, storefronts, aluminum swing doors, aluminum sliding doors, aluminum store fronts, aluminum curtain walls [sic], aluminum terrace doors, and hardware as well as . . . glazing work and sealant work." Doc. 26, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., p. 17. The majority of this work clearly falls within Ashford's business description, including Ashford's glazing work and installation of doors. The exclusion therefore does not preclude Defendant's duty to defend.

defend on the part of Defendant, because EGH's underlying complaint alleged property damage resulting from G.T. Leach, the subcontractors, and Emerald's changes to the "skin" of the condominium project. With respect to the "Exclusion-Exterior Insulation and Finish System" endorsement exclusion, Defendant cites to EGH's allegation that "thin stucco" was a contributing factor in the resulting water leaks that allegedly damaged EGH's property as triggering the exclusion.

Although EGH's allegations regarding defects in the design of the building and moisture infiltration caused in part by thin stucco may potentially trigger the endorsement exclusions cited by Defendant, the court notes that EGH also alleged that, apart from the thin stucco and failure to follow design requirements, "poor joint construction, improper sheathing, . . . poor sealing around penetrations, and other construction deficiencies" contributed to the creation of water leaks, which in turn caused property damage.[69] Because Defendant has failed to show that the cited endorsement exclusions are applicable to the aforementioned construction defect allegations, the court finds that these endorsement exclusions do not preclude the possibility that the underlying complaint alleges claims potentially covered by the CGL policies. Provided that at the allegations give rise to at least one claim potentially covered

---

[69]     Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., EGH's 2nd Am. Compl., ¶ 18.

29

by the CGL policies, Defendant is required to defend the insureds. See <u>Utica Nat'l Ins. Co. of Tex.</u>, 141 S.W.3d at 201.

The court now turns to the applicability of the remaining exclusions cited by Defendant. Directing the court to the exclusions contained in provisions 1.2(j), 1.2(k), 1.2(l) and 1.2(m), and definitions of terms related thereto, Defendant generally contends that all of EGH's allegations in the underlying litigation are about "property damage to [Ashford's] work or product or some part of the condo project where [Ashford] performed its work," and are therefore excluded from coverage.[70] The court disagrees.

### 1. Provisions 1.2(j)(5) and 1.2 (j)(6)

Provisions 1.2(j)(5) and 1.2(j)(6) exclude coverage for property damage to:

> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
> . . .
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."[71]

Construing the plain meaning of provision 1.2(j)(5), Texas

---

[70]    Doc. 26, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., p. 18.

[71]    Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 34, §§ 1.2(j)(5)-(6); Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 33, §§ 1.2(j)(5)-(6).

courts have determined that "the use of the present tense indicates that the exclusion applies to circumstances where the contractor or subcontractors are *currently* working on the project." <u>CU Lloyd's of Tex. v. Main St. Homes, Inc.</u>, 79 S.W.3d 687, 696 (Tex. App.–Austin 2002, no pet.) (emphasis in original); <u>see also</u> <u>Mid-Continent Cas. Co. v. JHP Dev., Inc.</u>, 557 F.3d 207 (5th Cir. 2009). Some of EGH's allegations in the underlying complaint assert that additional water leaks formed after substantial completion of the project and that said additional leaks damaged "building components around the pool, deck, and areas below," as well as windows and doors.[72]  As these assertions indicate that some of the alleged property damage occurred after the completion of the project, the court finds that the exclusion contained in provision 1.2(j)(5) does not apply to preclude Defendant's duty to defend G.T. Leach and Ashford in the underlying litigation.

With respect to provision 1.2(j)(6), the Fifth Circuit has held that the plain language of the exclusion:

> bars coverage only for property damage to parts of a property that were themselves the subject of defective work by the insured; the exclusion does not bar coverage for damage to parts of a property that were the subject of only nondefective work by the insured and were damaged as a result of defective work by the insured on other parts of the property.

<u>JHP Dev., Inc.</u>, 557 F.3d at 215 (distinguishing authorities that

---

[72]     Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., EGH's 2nd Am. Compl., ¶ 19.

appear to support a contrary interpretation).  Here, the underlying
allegations indicate that the water leaks which formed in the
condominium project damaged otherwise nondefective property and
work.   Liberally construing these allegations, the court finds
that, to the extent EGH alleged damage to property not otherwise
defective, regardless of whether G.T. Leach, Ashford, or another
subcontractor worked on the nondefective property, provision
1.2(j)(6)'s exclusion does not apply to preclude Defendant's duty
to defend G.T. Leach and Ashford in the underlying litigation.

**2. Provisions 1.2(k) and 1.2(l)- "Damage to Your Product" and
"Damage to Your Work" Exclusions**

Defendant also cites provisions 1.2(k) and 1.2(l) as excluding
coverage for the claims asserted in the underlying litigation.
Provisions 1.2(k) and 1.2(l) exclude coverage for property damage
arising out of "your product" and "your work," respectively.[73]
Although both exclusions preclude liability coverage for damages by
the insured's defective work, they do not preclude coverage for
damage to other property resulting from the defective work or
product.  Wilshire Ins. Co. v. RJT Const., LLC, 581 F.3d 222, 226
(5th Cir. 2009) (determining that provision 1.2(l) "precludes
coverage for liability for repairing or replacing the insured's own
defective work; it does not exclude coverage for damage to other
property resulting from the defective work."); Dal-Tile Corp. v.

---

[73]      Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J.,
2006-07 CGL Policy, p. 34, §§ 1.2(k)-(l); Doc. 26-5, Ex. C to Def.'s Resp. to
Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 33, §§ 1.2(k)-(l).

Zurick Am. Ins. Co., No. Civ. A. 3:02-CV-0751-K, 2004 WL 414900, at *5 (N.D. Tex. Feb. 2, 2004) (determining that exclusions like those in provision 1.2(k) "provide coverage for the insured's liability for damages to other property resulting from the defective condition of the work even though the injury to the work product itself is excluded.") (citing Sarabia v. Aetna Casualty and Surety Co., 479 S.W.2d 157, 157-58 (Tex. App.–El Paso 1988, no pet.)) (unpublished).

The court also notes that the "your product" exclusion generally does "not apply to the construction of [a] building because in ordinary language buildings are constructed or erected, not manufactured, and because any ambiguity in the policy language must be construed against the insurer and in favor of the insured." Mid-United Contractors, Inc. v. Providence Lloyds Ins. Co., 754 S.W.2d 824, 826 (Tex. App.–Fort Worth 1988, pet. denied); see Building Specialties, Inc. v. Liberty Mut. Fire Ins. Co., 712 F. Supp. 2d 628, 646-47 (S.D. Tex. 2010); Main St. Homes, Inc., 79 S.W.3d at 697 (quoting Providence Lloyds Ins. Co., 754 S.W.2d at 826).   Thus, to the extent Defendant's argument for applying provision 1.2(k) to the construction of the condominium complex, the exclusion is inapplicable.[74]

---

[74]   The court recognizes that Ashford's work on the condominium project allegedly included the installation of products or works that are not considered "a building or its components" for purposes of the "your product" exclusion contained in provision 1.2(k).  See Building Specialties, Inc., 712 F. Supp. 2d at 646-47.  Nonetheless, the exclusion does not apply for the reasons articulated above.

As discussed above, the underlying allegations indicate that otherwise nondefective property was damaged by the defective construction and work of G.T. Leach and the subcontractors, including Ashford.   Specifically, the damaged property that was otherwise nondefective included "building components around the pool, deck, and areas below," as well as windows and doors.[75]   These allegations, construed liberally, raise claims potentially covered by the CGL policies despite the cited exclusions of provisions 1.2(k) and 1.2(l).   Accordingly, Defendant has failed to prove that the "your product" and "your work" exclusions apply to preclude its duty to defend G.T. Leach and Ashford in the underlying litigation initiated by EGH.

**3.   Provision 1.2(m)- "Damage to Impaired Property or Property Not Physically Injured" Exclusion**

Under the CGL policies, provision 1.2(m) precludes liability coverage for:

> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work"

---

[75]     Doc. 15-1, Pl.'s App'x in Support of Mot. for Partial Summ. J., EGH's 2nd Am. Compl., ¶ 19.

after it has been put to its intended use.[76]

"Impaired property" was defined as tangible property other than the insured's work that either cannot be used or is less useful because:

> (a) [i]t incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or (b) [y]ou have failed to fulfill the terms of a contract or agreement; if such property can be restored to use by:
> (a) [t]he repair, replacement, adjustment or removal of "your product" or "your work"; or (b) [y]our fulfilling the terms of the contract or agreement.[77]

Here, the allegations in the underlying litigation have asserted physical injury, in the form of water damage, to otherwise nondefective property. As provision 1.2(m)'s exclusion applies solely to impaired property or property that has not been physically injured, it does not apply to the factual allegations articulated in the underlying litigation. That EGH may also contend that it incurred damages for impaired property or property that was not physically harmed does not extinguish Defendant's duty to defend G.T. Leach and Ashford in the underlying litigation.

Given the above discussion, the court **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED** as to Defendant's duty to defend G.T. Leach and Ashford against the

---

[76]     Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 34, § 1.2(m); Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 33, § 1.2(m).

[77]     Doc. 26-4, Ex. B to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2006-07 CGL Policy, p. 41, § 5.8; Doc. 26-5, Ex. C to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., 2007-08 CGL Policy, p. 40, § 5.8.

claims asserted in the EGH lawsuit; **GRANTED** as to Defendant's duty to defend Ashford in the Condo Association lawsuit; and **DENIED** as to Defendant's duty to defend G.T. Leach in the Condo Association lawsuit.  The court further **RECOMMENDS** that Defendant's motion for summary judgment on the absence of a duty to defend G.T. Leach in the Condo Association suit be **GRANTED.**  The court **RECOMMENDS** that summary judgment in favor of Defendant be **DENIED** on Defendant's remaining duty to defend arguments.

**E.  Duty to Indemnify**

Defendant moves for summary judgment seeking a declaration that Defendant does not have a duty to indemnify Ashford and G.T. Leach in the underlying litigation.

The duty to indemnify is triggered only by the actual facts establishing the insured's liability in the underlying litigation. Colony Ins. Co. v. Peachtree Const., Ltd., 647 F.3d 248, 253 (5th Cir. 2011) (applying Texas law); Cowan, 945 S.W.2d at 821. Accordingly, the duty to indemnify often "cannot be ascertained until the completion of litigation, when liability is established, if at all." Peachtree Const., Ltd., 647 F.3d at 253; see Farmers Tex. County Mut. Ins. Co. v. Griffin, 955 S.W.2d 81, 84 (Tex. 1997).  Because the underlying litigation has not been completed and liability has not been established, the court finds that Defendant's motion for summary judgment on its duty to indemnify is not ripe for adjudication.

36

The court therefore **RECOMMENDS** that Defendant's motion for summary judgment on its duty to indemnify be **DENIED** at this time. Defendant may refile its motion as to the duty to indemnify upon the determination of liability in the underlying litigation.

### V.   Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's Motion for Partial Summary Judgment be **GRANTED IN PART, DENIED IN PART** and that Defendant's Motion for Summary Judgment be **GRANTED IN PART, DENIED IN PART**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 27th day of December, 2012.

Nancy K. Johnson
United States Magistrate Judge

37